

FILED

Mar 20 2024, 9:31 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



I N   T H E

# Court of Appeals of Indiana

Ashley Jackson, as Personal Representative of the Estate of
Michael L. Jackson, Deceased,

*Appellant-Plaintiff*

v.

E&B Paving, LLC, Hanson Professional Services, Inc., Fox
Contractors Corp., Crawford Murphy & Tilly, Inc., Indiana Sign
& Barricade, Inc., City of Indianapolis, Marion County Board of
Commissioners, and Marion County Board of Public Works,

*Appellees-Defendants*

---

March 20, 2024

Court of Appeals Case No.
23A-CT-950

Appeal from the Marion Superior Court

The Honorable Patrick J. Dietrick, Judge

Trial Court Cause No.
49D12-2004-CT-13459

**Opinion by Judge Riley**
Judges Foley and Felix concur.

**Riley, Judge.**

## STATEMENT OF THE CASE[1]

Appellant-Plaintiff, Ashley Jackson, as personal representative of the Estate of Michael L. Jackson (the Estate), appeals the trial court's summary judgment in favor of Appellees-Defendants, E&B Paving, LLC (E&B), Fox Contractors, Corp. (Fox), and Hanson Professional Services, Inc. (Hanson) (collectively, the Defendants).[2]

We affirm.

## ISSUE

The Estate presents this court with one issue, which we restate as: Whether genuine issues of material fact exist precluding summary judgment for the

---

[1] On February 27, 2024, we held oral argument. Our thanks to Wabash College for its hospitality and to Prof. Jeffrey Drury, Chair of the Rhetoric Department, for his continued support of the Court's traveling oral arguments. We also thank counsel for the parties for their professional presentations.

[2] Litigation is ongoing against co-defendants Crawford, Murphy & Tilly, Inc., and the City of Indianapolis, who did not move for summary judgment and do not participate in this appeal. Co-defendants Marion County Board of Commissioners and Marion County Board of Public Works do not participate in this appeal. After the Estate filed its appellate brief, it settled with Indiana Sign & Barricade, Inc., the subcontractor/provider of traffic control signage and markers for the Project. On September 27, 2023, the motions panel of this court granted the joint motion of the Estate and Indiana Sign & Barricade, Inc., to dismiss with prejudice the Estate's appeal against Indiana State & Barricade, Inc., only. Therefore, we disregard the Estate's appellate arguments pertaining to that co-defendant.

Defendants on the issue of whether they owed Michael L. Jackson (Jackson) any duty of care sufficient to support its negligence claims.

## FACTS AND PROCEDURAL HISTORY

[4] In the summer of 2018, the City of Indianapolis (the City) was in the midst of a project to repave, add sidewalks, and add pedestrian traffic control devices to sections of Mitthoeffer[3] Road on the east side of Indianapolis between 30th and 38th Streets (the Project). The portions of Mitthoeffer Road involved in the Project did not have any pre-existing accommodations for pedestrians in the form of sidewalks, dedicated pedestrian travel paths, or dedicated pedestrian footpaths. Prior to the commencement of the Project, the west side of Mitthoeffer Road had no sidewalk, and the east side of Mitthoeffer Road had a paved shoulder.

[5] The firm of Crawford, Murphy & Tilly (CMT) designed the Project, which did not provide for any pedestrian traffic management in the form of crosswalks, alternate pedestrian walkways, or in any other manner during the Project. The City contracted with E&B to be its general contractor on the Project (the Agreement). The City also hired Hanson through the Professional Services Agreement (PSA) to be its resident project representative (RPR) on the Project, meaning that it was to observe the Project for compliance with CMT's plans and report to the City, among other duties. E&B subcontracted with Fox to

---

[3] "Mitthoeffer" is at times spelled "Mitthoefer" in the record.

provide certain services, including excavation of the paved shoulder on the east side of Mitthoeffer, for the Project. E&B, Fox, and Hanson did not design any plans or specifications for the Project.

[6] On July 22, 2018, while walking within the Project zone on the east side of Mitthoeffer Road near John Jay Drive, Jackson was struck and killed by a vehicle driven by Karl R. Satter, II (Satter).[4] On April 8, 2020, the Estate filed a Complaint, which it amended for the final time on June 25, 2020, alleging wrongful death due to negligence and naming, among others, CMT, the City, E&B, Fox, and Hanson.

[7] Each of the Defendants appeared and answered the Complaint. On September 3, 2020, July 21, 2022, and August 2, 2022, Fox, Hanson, and E&B, respectively, filed its motion, memorandum, and designation of evidence in support of summary judgment. Copious summary judgment briefing ensued. The Defendants argued in relevant part that they owed no duty to Jackson to provide an alternate pedestrian route during construction and that they followed CMT's plans which contained no provisions for an alternate pedestrian route. The Estate argued in relevant part that E&B, Fox, and

_____

[4] The Estate named Satter as a co-defendant in the Complaint. Satter subsequently settled with the Estate. On May 12, 2021, Satter was dismissed from the instant lawsuit by stipulation of the parties. The trial court took judicial notice of the fact that Satter was convicted of Level 5 felony failure to remain at the scene of an accident that resulted in death relating to the July 22, 2018, fatal collision.

Hanson had assumed a duty to Jackson through the contractual terms of the Agreement and the PSA.

[8]     On August 3, 2022, and on January 30, 2023, the trial court held hearings on the Defendants' motions. On March 30, 2023, the trial court issued three separate orders granting summary judgment to E&B, Fox, and Hanson based on its conclusion that, as a matter of law, none of the Defendants owed a duty of care to Jackson. As to E&B, the trial court entered the following relevant findings and conclusions:

> 7.  There was nothing in the design plans regarding temporary walkways or sidewalks on the east side of the roadway. While a [City] project specification provided that "pedestrian traffic shall be maintained and disruption kept to a minimum", the designer of the project did not consider plans or designs which redirected pedestrian traffic because there was no existing sidewalk or other pedestrian pathway which was being closed. The designer testified that the design complied with the [Indiana Department of Transportation's (INDOT)] specifications and the Indiana Manual on Uniform Traffic Control Devices [(IMUTCD)].
>
> * * * *
>
> 1.  E&B did not have a duty to provide [Jackson] with a pedestrian pathway at the time of the subject accident;
>
> 2.  The plans and specifications relative to the subject contract, which did not provide for the construction of a pedestrian pathway, were not so obviously dangerous that no reasonable contractor would follow them;
>
> 3.  That E&B did not breach any duty to [Jackson] to perform its work in conformance with the applicable plans and specifications;

4. To the extent Fox . . . performed [its] respective work in a negligent manner and/or in violation of the applicable plans and specifications, and the same was a responsible cause of [Jackson's] death, E&B is without liability for any such acts or omissions.

(Appellant's App. Vol. II, pp. 39, 42). The trial court entered the following relevant findings and conclusions regarding Fox:

26. CMT testified that the designs complied with the INDOT specifications and the [IMUTCD].

* * * *

36. [] Fox was contracted by E&B to perform specific work as part of the Mitthoeffer Project. No employees of Fox were present on the Mitthoeffer Project on the date of Jackson's incident, July 22, 2018. The last time any Fox employee performed work on the Mitthoeffer Project was July 18, 2020, four (4) days prior to the incident. Additionally, the area of Fox's work on July 18, 2020 was approximately 1400 feet south of the location of this accident.

37. Furthermore, the undisputed evidence establishes Fox's work on the project was performed in compliance with the [P]roject plans and specifications, including the IMUTCD. The [P]roject plans and design drawings did not have any alternative pedestrian paths called for related to the shoulder removal. There is no support in either the contract documents or deposition testimony of the parties that there was any requirement for an alternative pedestrian pathway to be provided related to the shoulder removal.

38. "There is no breach of duty and consequently no negligence where a contractor merely follows the plans or specifications given him by the owner so long as they are not so obviously dangerous or defective that no reasonable contractor would follow them." *Peters v. Forester, 804 N.E.2d 736, 742 (Ind. 2004); see also Raytheon Engineers Y Constructors, Inc. V. Sargent Elec. Co.*, 932 N.E.2d 691 (Ind. Ct. App. 2010).

> 39. The [c]ourt finds there is no evidence the [P]roject plans prepared by CMT and followed by Fox as it relates to the shoulder removal were obviously dangerous or defective.

(Appellant's App. Vol. II, pp. 47-49). Lastly, as to Hanson, the trial court entered the following relevant findings and conclusions:

> 64. [The Estate] argues Hanson purportedly had a duty to ensure compliance by others on the Project with all aspects of the IMUTCD and other applicable laws, regardless of the information set forth in the design documents.
>
> 65. [The Estate's] argument relies on provisions set forth in the ["Policy and Procedures Manual for Inspection of Locally Funded Construction Projects" (City Manual)] (incorporated by reference into the [PSA]) and the IMUTCD (referenced in the [City] Manual). However, the preamble to the [City] Manual states as follows: "Nothing in this manual shall operate as or be construed as modifying, supplementing, or otherwise changing or altering the provisions of the Contract Documents between the Contractor and the [City], including, without limitation Article 8 of the General Conditions or the provisions of the [PSA] between [Hanson] and [the City]." Based on the plain, unambiguous terms of these documents, the [c]ourt finds that neither the [City] Manual nor the IMUTCD can be interpreted in a manner that would "modify, supplement, or otherwise change or alter" the terms of the [PSA]. As such, no provisions or terms in the [City] Manual or IMUTCD can serve as a basis for imposing a contractual duty on Hanson.

(Appellant's App. Vol. II, pp. 62-63) (record citations and emphasis omitted). Pursuant to Indiana Trial Rule 54(B), the trial court entered its summary judgments as final, appealable judgments.

[9] The Estate now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

I. *Standard of Review*

The Estate appeals following the trial court's grant of summary judgment to E&B, Fox, and Hanson. Our supreme court recently reiterated our standard of review of a trial court's summary judgment as follows:

> We review the trial court's summary judgment decision de novo. [The moving party] is entitled to summary judgment if the designated evidence shows there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. A genuine issue of material fact exists when there is contrary evidence showing differing accounts of the truth, or when conflicting reasonable inferences may be drawn from the parties' consistent accounts and resolution of that conflict will affect the outcome of a claim. To the extent we have any doubts concerning the existence of a genuine issue of material fact, we must resolve those doubts in favor of the nonmoving party.

*Z.D. v. Com. Health Net., Inc.*, 217 N.E.3d 527, 531 (Ind. 2023) (citations and internal quotes omitted). The party moving for summary judgment bears the initial burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Sargent v. State*, 27 N.E.3d 729, 731 (Ind. 2015). "Summary judgment is improper if the movant fails to carry its burden, but if it succeeds, then the nonmoving party must come forward with evidence establishing the existence of a genuine issue of material fact." *Id.* at 731-32. The nonmoving party against whom summary judgment was entered has the burden on appeal to persuade us that the trial court's grant of summary judgment was in error, but we will scrutinize the trial

court's decision to ensure that the nonmovant is not improperly denied his day in court. *Gochenour v. CSX Transp., Inc.*, 44 N.E.3d 794, 799 (Ind. Ct. App. 2015), *trans. denied*. When reviewing the grant of summary judgment, we may affirm the trial court's ruling on any basis apparent in the record. *Markey v. Estate of Markey*, 38 N.E.3d 1003, 1006-07 (Ind. 2015). Inasmuch as the Estate's claims require us to construe contractual provisions, those are matters of law particularly suitable for summary judgment which we review de novo. *Alexander v. Linkmeyer Dev. II, LLC*, 119 N.E.3d 603, 612 (Ind. Ct. App. 2019).

[11] Before proceeding to the merits of the Estate's claims, we observe that the trial court entered findings of fact and conclusions thereon. Special findings are not required in summary judgment proceedings and are not binding on appeal. *AutoXchange.com. Inc. v. Dreyer and Reinbold, Inc.*, 816 N.E.2d 40, 48 (Ind. Ct. App. 2004). However, such findings offer this court valuable insight into the trial court's rationale for its review and facilitate appellate review. *Id.*

## II. *Assumption of Duty Through Contract*

[12] The Estate brought wrongful death claims sounding in negligence against E&B, Fox, and Hanson. In order to prevail in a negligence suit, a plaintiff must prove "three elements: (1) a duty on the part of the defendant in relation to the plaintiff; (2) a failure by the defendant to conform its conduct to the requisite standard of care; and (3) an injury to the plaintiff proximately caused by the failure." *Coleman v. Charles Court, LLC*, 797 N.E.2d 775, 788 (Ind. Ct. App. 2003). To prevail on a motion for summary judgment in a negligence suit, a defendant must show that the undisputed facts negate at least one of these

elements. *Id.* In the absence of a duty, "there can be no negligence or liability based upon the breach." *Goodwin v. Yeakle's Sports Bar and Grill, Inc.*, 62 N.E.3d 384, 386 (Ind. 2016). The existence of a duty is a question of law for the court to decide. *Id.* at 387.

[13] "A duty of care may arise where one party assumes a duty." *Estate of Staggs v. ADS Logistics Co., LLC*, 102 N.E.3d 319, 323 (Ind. Ct. App. 2018), *trans. denied*. A party may assume a duty through contractual provisions if those provisions affirmatively evince an intent to assume the duty. *Id.* In determining whether a contracting party assumed a duty of care, we are guided by well-established principles of contract interpretation. *Ryan v. TCI*, 72 N.E.3d 908, 914 (Ind. 2017). We will determine the intent of the parties at the time they entered into the contract by examining the language used to express the parties' rights and duties. *Id.* We look at the contract as a whole, and we interpret the contract in a manner which harmonizes all its provisions, giving the contract's clear and unambiguous terms their ordinary meaning. *Id.* The Estate contends that E&B, Fox, and Hanson each assumed a contractual duty to the public using Mitthoeffer Road during the Project, including Jackson, to safeguard pedestrian traffic. We examine this claim as to each Defendant in turn.

*A. E&B*

[14] The Agreement between E&B and the City listed a number of "Contract Documents", which included the Agreement itself, the Project plans, the City's Standards and Specifications, and INDOT's Standard and Supplemental Series, Sections 200 through 900, listed in that order. The Agreement provided that

the Contract Documents "accurately and fully describe the terms and conditions upon which [E&B] is willing to furnish the labor, tools, material, equipment, services and perform the [w]ork called for by the Contract Documents . . . ." (Appellant's App. Vol. VII, p. 22). The City and E&B agreed that the Contract Documents were "as fully a part of this Agreement as if set out verbatim herein or attached hereto and the same do in all particulars become the Agreement between the parties hereto in all matters and things set forth herein and described[.]" (Appellant's App. Vol. VII, p. 23). Another provision of the Agreement provided that "[a] requirement occurring in one Contract Document is binding as though occurring in all Contract Documents[.]" (Appellant's App. Vol. VII, p. 23).

[15] One of the City's Standards and Specifications provided that

> [p]edestrian traffic also shall be maintained and disruption thereof kept to a minimum. . . . If adequate sidewalk area is not available, the CONTRACTOR shall divert pedestrian traffic across the street and shall provide all materials necessary to provide for the crossover.

(Appellant's App. Vol. VII, p. 37). Another Contract Document, INDOT's Standard Specification Section 801.03, referenced the IMUTCD, sections 6A and 6D of which provide that the "needs and control of all road users [including pedestrians] . . . shall be an essential part of highway construction" and that if a temporary traffic control zone "affects the movement of pedestrians, adequate pedestrian access and walkways shall be provided." (Appellant's App. Vol. VII, p. 66) (additional emphasis in original omitted).

Citing these provisions, the Estate argues that E&B assumed a duty to provide pedestrian crossovers or walkways during the Project or to safeguard pedestrian safety in some other manner, such as alerting the City of the need for additional pedestrian safety measures at the Project.

[16] We cannot agree. In addition to the Agreement provisions and the selected portions of the Contract Documents which were incorporated into the Agreement by reference, the Agreement contained the following provisions:

> In resolving conflicts, errors, discrepancies[,] and disputes concerning the nature, character, scope or extent of [work] to be performed or furnished by [E&B], or other rights and obligations of the [City and E&B], arising from or prescribed by one or more of the Contract Documents, the following rules shall govern:
>
> * * * *
>
> .3  The Contract Documents shall be given precedence in the order listed in Paragraph 1.1. above; and
>
> .4  In documents of equal priority, if any such conflict, error, discrepancy or dispute cannot be resolved or reconciled by application of the rules in Subparagraphs 1.2.1 through 1.2.3, then the provision expressing the greater quantity, quality, or scope of work, or imposing the greater obligation upon the CONTRACTOR or affording the greater right or remedy to the [City] shall govern, without regard to the party who drafted such provisions.

(Appellant's App. Vol. VII, pp. 23-24). The City and INDOT specifications relied upon by the Estate only specifically refer to the provision of pedestrian crossovers and/or pedestrian walkways. Those specifications do not refer to any larger or expanded duty to report issues or to safeguard pedestrian safety through other means. It is a well-settled principle of contract interpretation that

we do not add terms to a contract. *See Care Group Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 745, 756 (Ind. 2018) ("[W]e will not add tacit terms into the parties' express, agreed-upon ones."). Therefore, we reject the Estate's proposition to read into the Agreement additional pedestrian safeguarding measures beyond the provision of crossovers and sidewalks.

[17]    It is undisputed that the Project plans did not provide for pedestrian crossovers or walkways. The incorporation of the City and INDOT specifications into the Agreement created a conflict or a discrepancy between the Project plans and the City and INDOT specifications. Pursuant to subparagraph .3 of the Agreement's conflict resolution provision, the Project plans, which were listed before the City and INDOT specifications, took precedence over the cited specifications. Subparagraph .4 does not apply here, as the Project plans, City Standards and Specifications, and the INDOT Standard Specifications were not Contract Documents of equal priority. Therefore, according to the plain and unambiguous terms of the Agreement, E&B's scope of work did not extend to the provision of pedestrian crossovers and walkways, and E&B did not assume any duty to provide the same.

[18]    Contrary to the Estate's assertions, *Smith v. Walsh Construction Company II, LLC*, 95 N.E.3d 78 (Ind. Ct. App. 2018), *trans. denied*, does not support the existence of a duty of care on the part of E&B. In that case, a motorist was killed when his vehicle allegedly encountered a substantial amount of mud that had accumulated on the surface of the roadway near an INDOT bridge construction project. *Id*. at 83. The motorist's estate sued the general contractor, Walsh, and

several subcontractors, among others, for wrongful death. *Id*. at 83-84. In affirming the denial of summary judgment for Walsh, another panel of this court found that Walsh owed a non-delegable duty of care to the killed motorist and to the public who used the roadway due to specific, express provisions in Walsh's contract with INDOT in which Walsh agreed to "take all reasonably necessary actions to protect . . . the safety of the public . . .", to provide a stable construction entrance to be built of twelve inches of stone where construction traffic would enter the roadway, to address any and all degradation and erosion control issues occurring at the site, to ensure that "the roadway, structures, barricades, and construction [be] kept in satisfactory condition at all times", and to provide for the prompt removal of all dirt and other materials deposited on the roadways by construction operations if the accumulation was enough to form mud or create a traffic hazard. *Id*. at 85-86. The *Smith* court further concluded that, even if these duties had been delegable, there was no genuine issue of material fact that Walsh had not, indeed, delegated those duties to any of its subcontractors. *Id*. at 86. Therefore, the court held that "[b]y deciding to perform this work, Walsh elected to assume a duty of care with respect to the work." *Id*.

[19] The *Smith* court reversed the trial court's grant of summary judgment to the subcontractor responsible for installing erosion control measures, Roudebush, also concluding, as it had for Walsh, that Roudebush had assumed a contractual duty towards the killed motorist and the general public. *Id*. at 93-94. As to Roudebush, the estate had argued that the subcontractor should have

done more than simply follow the design plans for the bridge contract for erosion control measures by insisting that silt fencing or other erosion control measures not called for by the plans be installed. *Id.* at 93. The subcontract between Walsh and Roudebush contained specific, express provisions that Roudebush was assuming toward Walsh all of the obligations Walsh had assumed in its contract with INDOT. *Id.* at 93. The subcontract further provided that Roudebush had a duty to notify Walsh of any defects in its own work or in the work of any other entity, to notify Walsh of any unsafe site conditions not expressly within its responsibility, and to keep the public streets and roadways free of dirt. *Id.* at 93-94. The Roudebush/Walsh subcontract also incorporated by reference some INDOT requirements pertaining to the installation of temporary erosion and sediment control measures that were contained in the Walsh/INDOT contract. *Id.* at 94. The *Smith* court held that "[i]n light of these contractual provisions as a whole, it is apparent that Roudebush had a contractual duty to consider whether additional erosion control measures (in addition to those specific in [the designer's] plans) were required[.]" *Id.*

[20] Contrary to the Estate's arguments on appeal, *Smith* does not stand for the proposition that, simply by entering into contracts pertaining to a public project, a general contractor or subcontractor always owes a duty of care to the general public, that a contractor always has a duty to investigate or inquire into additional ways of accomplishing a project plan's goals or directives, or that the incorporation of INDOT specifications into a contract is always binding.

Rather, *Smith* turned on the terms of the specific contracts involved between INDOT, Walsh, and Roudebush which differ from the Agreement in the instant case in material aspects, in that the Agreement did not contain express provisions that E&B would guarantee public safety, did not provide for the installation of pedestrian crossovers and sidewalks, and did contain a conflict resolution clause that made the Project plans prevail over any conflicting City and INDOT specifications. *See id.* at 85-86, 93-94. Therefore, although we do so on different grounds relied upon by the trial court, we affirm the entry of summary judgment in favor of E&B. *See Markey*, 38 N.E.3d at 1006-07 (holding that we may affirm a summary judgment on any basis supported by the record).

### B. *Fox*

[21] On appeal, the Estate claims, as it did during summary judgment proceedings below, that subcontractor Fox owed a duty to Jackson and to other pedestrians because its contract with general contractor E&B incorporated "multiple components" of E&B's contract with the City, including "General Conditions and Provisions, Plans, Specifications, [and] Special Provisions[.]" (Appellant's Br. p. 9). Thus, the Estate's argument for the existence of a duty on Fox's part is predicated on the existence of a duty by E&B. Having concluded that E&B did not assume such a duty in its own contract with the City, we must conclude that neither did Fox. Accordingly, we do not disturb the trial court's entry of summary judgment as to Fox.

### C.  *Hanson*

[22]  Hanson entered into the PSA with the City, pursuant to which it agreed to provide a resident project representative, inspectors, and clerical and secretarial personnel, to perform administrative and record keeping functions, to serve as a liaison between the Project contractors and the City, to observe the unfolding construction work, and to inspect work for compliance with the Project plans. In its "Description of Services" section, the PSA provided that Hanson agreed to "[a]dminister the contract in accordance with the current edition of [the City Manual]".  (Appellant's App. Vol. V, p. 117).  The City Manual contained the following two sections relevant to the Estate's summary judgment arguments:

> 2-1. Gather Documents and Review
>
> * * * *
>
> [Hanson] should become completely familiar with all documents necessary for the inspection and construction of the [P]roject prior to commencement of construction.
>
> * * * *
>
> 2-5. Field Visit
>
> After the Contract Documents[5] have been reviewed, and well in advance of construction, [Hanson] shall visit the [P]roject site and become familiar with existing site conditions.  [Hanson] shall perform an onsite field check of the entire [P]roject with the [P]roject plans, note locations of key elements of the [P]roject,

---

[5] "Contract Documents" are defined in the PSA as the "plans, addenda, and the contract information book", which is the book with the City's "project requirements including the bid front end documents, technical specifications and special conditions."  (Appellant's App. Vol. V, pp. 68, 70).

and become familiar with possible interferences with existing residences, businesses, *pedestrian traffic*, or the motoring public prior to the contractor starting work.

(Appellant's App. Vol. VIII, pp. 70, 72) (emphasis added). In addition, the City Manual incorporates as reference material the IMUTCD containing the previously-cited provisions relevant to pedestrian safety. The Estate contends that these portions of the City Manual, as incorporated into the PSA, created a duty of care on Hanson's part to Jackson and to the public.

[23] However, as found by the trial court, the City Manual's Introduction contains the following statement:

> Nothing in this manual shall operate as or be construed as modifying, supplementing, or otherwise changing or altering the provisions of the Contract Documents between [Hanson] and the [City], including without limitation, Article 8 of the General Conditions or the provisions of the [PSA].

(Appellant's App. Vol. VIII, p. 66). Therefore, by its plain and unambiguous terms, the City Manual cannot be construed in a way that modifies or supplements the PSA, and, therefore, it cannot provide a basis for establishing a contractual duty for Hanson in the manner the Estate argues. On appeal, the Estate emphasizes that the PSA incorporates the City Manual's provisions within its terms, and it contends that our reading renders the PSA's provision incorporating the City Manual a nullity. Yet, the PSA incorporates the entire City Manual, including the Introduction, and the Estate does not provide us with any legal authority for its implication that we may ignore the Introduction

of the City Manual. Neither does the Estate contend that the Introduction is ambiguous. When entering into the PSA, the parties could have disavowed or excluded the cited portion of the Introduction, but they did not. Rather, the City and Hanson's inclusion of the Introduction evinces their intent that the City Manual would not modify or supplement their contract. Accordingly, we also affirm the trial court's grant of summary judgment to Hanson.[6]

## CONCLUSION

[24] Based on the foregoing, we hold that there exist no genuine issues of material fact and that E&B, Fox, and Hanson are entitled to summary judgment as a matter of law.

[25] Affirmed.

Foley, J. and Felix, J. concur

ATTORNEYS FOR APPELLANT

Clayton C. Miller
Clayton Miller Law, P.C.
Indianapolis, Indiana

R.T. Green
Letha A. Maier
Collin W. Green

---

[6] Given the Estate's framing of the issues in its Appellant's Brief, our de novo standard of review, and our conclusions, we do not address the trial court's other rationales for granting summary judgment to E&B, Fox, and Hanson. In addition, because we have not relied on any challenged or disputed factual matters in reaching our conclusions, we do not address the Estate's arguments challenging the trial court's factual findings.

Team Green Law
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Bruce P. Clark
Bruce P. Clark & Associates
St. John, Indiana

Richard R. Skiles
Carlo T. Girolamo
Skiles DeTrude
Indianapolis, Indiana

William E. Kelley, Jr.
Tyler L. Jones
Drewry Simmons Vornehm, LLP
Carmel, Indiana